UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

NATHANIEL O'NEAL,
          Plaintiff,

vs.                                     Case No.: 3:21cv685/LAC/ZCB

SHAUNDERRICK M. GREEN, et al.,
          Defendants.
_____ /

## REPORT AND RECOMMENDATION

This is a *pro se* prisoner civil rights case filed under 42 U.S.C. § 1983.

Plaintiff Nathaniel O'Neal is an inmate of the Florida Department of Corrections

(FDOC).  His amended complaint names eight Defendants.  (Doc. 10).  Two

Defendants, Brandi Bray[1] and Amanda Wohlford, are nurses ("Nurse Defendants")

employed by a private contractor[2] that provides medical services to FDOC inmates.

(*Id.* at 5).  Six Defendants are correctional officers at Santa Rosa Correctional

---

[1] Plaintiff's amended complaint referred to this nurse as "Melinda Gray."  It was
subsequently revealed that the nurse's name is Brandi Bray.  (Doc. 45 at 1 n.1).
[2] The Nurse Defendants were employed by Centurion of Florida, LLC, a private
contractor that provides medical services to FDOC inmates.  Although a private
company, Centurion and its medical professionals are state actors for § 1983
purposes.  *Ancata v. Prison Health Servs., Inc.*, 769 F.2d 700, 703 (11th Cir. 1985).

1

Institution (SRCI): Shaunderrick Greene, Justin Neel, Evan Manners, Andrew Alligood, Cody Seaman, and Daniel O'Neal ("FDOC Defendants").  (*Id*. at 2-5).

Plaintiff asserts Eighth Amendment claims of excessive force and failure to intervene against the FDOC Defendants.  (Doc. 10 at 13-14).  He asserts an Eighth Amendment claim of deliberate indifference to serious medical needs against the Nurse Defendants.  (*Id*. at 14.).  The Nurse Defendants and the FDOC Defendants have moved for summary judgment.  (Docs. 69, 69-1 through 69-6; Docs. 66, 66-1 through 66-12 ).  Plaintiff has responded in opposition.  (Docs. 72, 91, 94).  The Nurse Defendants have replied.  (Doc. 93).  For the reasons below, Defendants' motions for summary judgment should be granted.

## I.    Factual Background

### A.    The use of force incident

Plaintiff was housed at SRCI on August 6, 2020.  (Doc. 10 at 7).  Shortly after 11:00 a.m., Plaintiff, Defendant Green and Officer Ryan Tremble—a nonparty— (both seen in the Hallway Video wearing protective smocks over light gray shirts) escorted Plaintiff into the B dormitory sally port for a medical call out.  (Doc. 69-2 (Hallway Video) at 11:08:01;[3] Doc. 66-5; Doc. 66-2).  A fixed video camera in the

---

[3] The court refers to the video of the sally port as the Hallway Video and cites to the time stamp indicated on the video.

hallway captured the entire incident. The video shows that as Plaintiff waited outside the medical triage room, Defendant Green was positioned on Plaintiff's left side and maintained a custodial hold with his right hand on Plaintiff's left arm. (Hallway Video at 11:08:01-11:08:38). Defendant Seaman (wearing a light gray shirt) entered the sally port. (Hallway Video at 11:08:08; Doc. 66-9 at ⁋ 8). Defendant Green attempted to place a COVID-19 face mask on Plaintiff, but Plaintiff shook his head in refusal. (Hallway Video at 11:08:20-11:08:31).

### 1. *What Plaintiff says happened*

After Plaintiff refused to wear the COVID-19 face mask, Defendant Green informed Plaintiff that he would be returned to his cell. As Plaintiff tells the story, he "didn't argue or debate" and "walked down the hallway" silently with Defendant Green. (Doc. 10 at 8, ⁋ 15). And then, "out of nowhere," Defendant Green struck Plaintiff on the shoulder and proceeded to use a "closed fist" to punch him on the neck and face. (*Id*. at 9, ⁋⁋ 16-17). After one of the punches to the chin, Plaintiff says he fell to the ground. (*Id*. at ⁋ 19). Once on the ground, Plaintiff claims Defendant Green used his elbows to inflict "heavy strikes" to Plaintiff's back, neck, and head. (*Id*. at ⁋ 20). Defendant Green then allegedly put Plaintiff's left wrist "in a bar while I was handcuffed and applied pressure." (*Id*. at ⁋ 21).

At that time, Plaintiff claims Defendant Seaman "joined in the attack" by taking hold of his wrist. (*Id*. at ⁋ 22). Defendant Green then supposedly began to "twist [Plaintiff's] left wrist around working [his] joints against each other and began to squeeze even tighter." (*Id*. at ⁋ 24). Next, Plaintiff says Defendant Neel and "six or seven other officials" entered the scene. (*Id*. at ⁋ 25). Defendant Neel "congratulate[d]" Defendant Green, which allegedly led Defendant Green to "squeeze" Plaintiff's wrist "even tighter." (*Id*. at ⁋ 27). Plaintiff claims he was "tortured on the ground" for "8-10 minutes" until a spit shield was placed over his head, and he was escorted back to his cell. (*Id*. at 10, ⁋⁋ 37-38).

### 2. *What the video shows happened*

Plaintiff's version of events is contradicted by video footage obtained from a fixed camera in the hallway where the incident occurred. Here is what the video shows happened when Plaintiff refused Defendant Green's request to put on a COVID-19 mask. After Plaintiff shook his head when asked to put on the mask, Defendant Green (with his hand on Plaintiff's arm) attempted to walk Plaintiff back to his cell. Plaintiff resisted, planted his foot onto the floor, and refused to move. (Hallway Video at 11:08:36-11:08:39; Doc. 91 ⁋⁋ 15-16). Defendant Green tugged on Plaintiff's arm, and Plaintiff tried to pull away. (Hallway Video at 11:08:37-11:08:39; Doc. 91 ⁋ 19).

4

At one point, Plaintiff lost his stance and started to fall in Defendant Green's direction. Plaintiff regained his balance and resisted Defendant Green's efforts to take him back to his cell. (Hallway Video at 11:08:42-11:08:44). As Defendant Green was pulling on Plaintiff's arm and Plaintiff was resisting, Defendant Green grabbed Plaintiff's shoulder and the two men fell to the ground. (*Id*. at 11:08:42-11:08:46). It is unclear from the video whether Defendant Green pulled Plaintiff to the ground or whether they both lost their footing and fell. Either way, they ended up on the ground. Once on the ground, the video shows that Defendant Green held Plaintiff down in the prone position. (*Id*. at 11:08:46-11:08:54). To keep Plaintiff under control, Defendant Green applied pressure to Plaintiff using his right elbow and subsequently his left elbow. (*Id*.).

Contrary to Plaintiff's allegations, the video shows that Plaintiff was non-compliant with Defendant Green's directive to return to his cell. The video also shows that at no point did Defendant Green punch Plaintiff with a closed fist. At no point does the video show Defendant Green striking Plaintiff with heavy blows to the back, the neck, or the head. Instead, the video shows Defendant Green using his unraised arms to hold Defendant in the prone position. From the moment Plaintiff refused to put on the mask until the moment he was secured on the floor, approximately ten seconds elapsed.

5

Once in the prone position, Plaintiff did not offer any resistance. (Hallway Video at 11:08:56-11:10:00). Officer Tyler Miller—a nonparty—was one of the officers in the neighboring office wearing a dark shirt. (Doc. 66-5). Miller exited the sally port to retrieve a handheld video camera. (Doc. 66-5; Hallway Video at 11:09:06). Defendant Neel (the shift supervisor shown in the video wearing a white shirt) and several other officers (wearing dark shirts) came out from a neighboring office to assist. (Hallway Video at 11:08:46-54; Doc. 66-8 ¶¶ 7-9).

Plaintiff was on the floor for approximately 8-10 minutes, while Defendant Green applied his body weight and held Plaintiff's left wrist in a "wrist bar." (Doc. 10 ¶¶ 21, 24, 27, 28, 38). During this time, one of the officers from the office (wearing a dark shirt) assisted Defendant Green by holding Plaintiff until another officer from the office (wearing a dark shirt) fully secured Plaintiff with ankle restraints. (Hallway Video at 11:08:54-11:09:23).

Plaintiff identifies Defendant Seaman as the officer assisting Defendant Green. (Doc. 91 ¶ 25). Plaintiff states Defendant Seaman forcefully held his right wrist. (*Id.*). Defendant Seaman denies using any force on Plaintiff. (Doc. 66-9 ¶ 8). The video shows that the officer assisting Defendant Green was one of the officers who emerged from the neighboring office wearing a dark shirt. The

assisting officer was relieved by Officer Tremble (wearing a protective smock) once Plaintiff's legs were secured with restraints. (Hallway Video at 11:09:41-11:10:00).

Plaintiff states Defendants Neel, Manners, Alligood, and O'Neal were among the officers in the neighboring office. (Doc. 91 ¶ 26). Plaintiff states these officers "stood by and watched" and made comments to "hype" Defendant Green and the assisting officer. (Doc. 91 ¶ 26; Doc. 10 ¶¶ 26, 29-35). Defendant Manners states he does not recall being involved in this incident or any incident involving Plaintiff. (Doc. 66-12 ¶¶ 7-8). Defendants Alligood and O'Neal state they were not present during the incident. (Doc. 66-11 ¶ 11; Doc. 66-10 ¶ 7).

The handheld video picks up after Plaintiff had been on the floor for several minutes and a special management spit shield had been placed on his face. (Doc. 10 ¶ 39; Doc. 69-3, Handheld video at 11:05:58)[4]. Defendant Neel read a lead-in statement on the handheld video, and Officer Miller identified himself as the camera operator. (Handheld video at 11:05:57-11:06:06). Within thirty seconds of the handheld video being activated, Defendant Green and Officer Tremble lifted Plaintiff to his feet and escorted him to his cell. (Handheld video at 11:05:58-

---

[4] As Defendants state, the time stamp on the handheld video is different than the time stamp on the Hallway Video. (*See* Doc. 69 at 2 n.2). For clarity, the court cites to the time stamp indicated on the cited video.

11:06:27; Doc. 10 ⁋ 40). Officers secured Plaintiff's cell mate, removed Plaintiff's leg restraints, and placed Plaintiff in his cell. (Handheld video at 11:07:26-11:08:20). Defendant Green removed Plaintiff's hand restraints and the spit shield. (Handheld video at 11:08:21-11:08:57).

## B.    The Nurse Defendants' alleged deliberate indifference

The remaining facts concern Plaintiff's claim that the Nurse Defendants were deliberately indifferent to his serious medical need. Plaintiff claims that once he was returned to his cell by the FDOC Defendants, he noticed that his left wrist was "out of place." (Doc. 10 at ⁋ 42). Plaintiff claims that his cell mate helped Plaintiff "pop his wrist back in place." (Doc. 1 at ⁋⁋ 43-44).

According to the handheld video, shortly after Plaintiff's return to his cell, Defendant Wohlford conducted a cell side post-use-of-force medical examination.[5]

---

[5] Under FDOC policy, when an inmate is considered a security risk, the inmate is secured in his cell by FDOC security staff until they determine the inmate is no longer a threat. (Doc. 69-4 at ⁋ 8; doc. 69-5 at ⁋ 8). Generally, after a use of force, a medical professional conducts a cell front examination, meaning, the inmate is examined through the window of the cell door. (Doc. 69-4 at ⁋⁋ 7-8). The purpose of the examination is to ensure that the inmate is stable and not in imminent danger of serious physical harm or suffering from an emergency medical condition warranting immediate medical attention. (*Id.*). Pursuant to FDOC's policies and procedures, an emergency medical condition is one that is life or function threatening and/or may cause the person to deteriorate rapidly. (*Id.* at ⁋ 8). Barring such circumstances, an inmate deemed a security risk will not be let out of his cell

(Doc. 69-4 at ℙ 7; Handheld video at 11:13:27-11:14:09; Doc. 69-1 at 7-8).   As depicted in the video, Defendant Wohlford spoke to Plaintiff and looked through the cell window as Plaintiff held up his left arm.  (Handheld video at 11:13:29-11:13:54; Doc. 69-4 at ℙ 11).  Plaintiff complained of pain and told Defendant Wohlford he was unable to move his wrist.  (Doc. 10 at ℙ 50; Doc. 69-1).  Defendant Wohlford assessed Plaintiff's wrist through the window, and the two of them conversed.  (Handheld video at 11:13:34-11:13:55; Doc. 10 at ℙ 50).  The video shows Plaintiff raising and lowering his left shoulder, and there appears to be some movement of his forearm, but the camera view is partially obstructed. (Handheld video at 11:13:34-11:13:54).

Defendant Wohlford observed that Plaintiff did not appear to be in any acute distress.  (Doc. 69-4 at ℙ 11).  Defendant Wohlford did not see any noticeable injuries to Plaintiff's left wrist and noted that he appeared to have normal range of motion.  (*Id.*).  Based on these observations, Defendant Wohlford determined Plaintiff did not require immediate medical attention and instructed him to follow-up with sick call.  (*Id.*).  Plaintiff alleges for the next eighteen days, he "called for medical emergencies,

---

for a medical examination, nor will a medical professional be allowed to enter the cell.  (*Id*. at ℙ 9).

9

asked for sick calls and even made a homemade cast for both my wrist [sic] that got painfully worse each day." (Doc. 10 at ℙ 56).

Plaintiff's medical records show that on August 7, 2020, at 5:00 a.m. (within 24 hours of the use of force), Nurse Kremer—a non-party—went to Plaintiff's cell to assess his vital signs. (Doc. 69-1 at 9). Plaintiff verbally refused medical services. (*Id.*). On August 8, 9, 12, and 15, various nurses—all non-parties—went to Plaintiff's cell to assess his vital signs. (Doc. 69-1 at 10-13). Plaintiff verbally refused medical services. (*Id.*). On each occasion, an additional staff member—all non-parties—witnessed Plaintiff's refusal of medical services. (*Id.*). On August 16, 2020, Defendant Wohlford went to Plaintiff's cell to assess his vital signs, but Plaintiff verbally refused medical services. (*Id.* at 14). On August 17, 2020, at 8:00 a.m., a non-party nurse went to Plaintiff's cell to assess his vital signs, but Plaintiff verbally refused medical services. (*Id.* at 15).

On August 25, 2020 (nearly three weeks after the use of force), Plaintiff declared a medical emergency and was examined cell side by Defendant Bray. (Doc. 69-5 ℙ 7; 69-1 at 16-17). The examination was conducted cell side because the prison staff considered Plaintiff a security risk. (Doc. 69-5 at ℙ 7). Plaintiff complained of bilateral wrist pain. (Doc. 69-1 at 16-17). Defendant Bray did not observe any deformities, bruising, swelling, or injury to Plaintiff's wrists. (Doc. 69-

5 at ⁋ 9; Doc. 69-1 at 16-17).  Defendant Bray observed Plaintiff's upward and downward movements and flexion were within normal limits, and circular and twisting options were within normal limits.  (Doc. 69-1 at 16-17).  Defendant Bray noted the range of motion of both wrists indicated no deformity except for Plaintiff's complaint that movement was painful.  (Doc. 69-5 at ⁋ 9; Doc. 69-1 at 16-17). Defendant Bray noted that Plaintiff voiced no acute distress, and her examination revealed no injuries.  (*Id.*).  Defendant Bray determined that Plaintiff did not need any further treatment and instructed him to follow up with medical as needed.  (*Id.*). If Defendant Bray had observed symptoms warranting further treatment, she would have referred Plaintiff for further treatment. (Doc. 69-5 at ⁋ 9).

On August 28, 2020, at 8:28 a.m., Plaintiff declared another medical emergency and was seen by Defendant Bray.  (Doc. 69-5 at ⁋ 10; Doc. 69-1 at 18-19).  Plaintiff complained of bilateral wrist pain.  (Doc. 69-1 at 18-19).  Defendant Bray observed the range of motion in both wrists was within normal limits.  (*Id.*). Defendant Bray noted flexion and extension with pronation and supination was within normal limits.  (*Id.*).  Defendant Bray further noted radial deviation and ulnar deviations were within normal limits.  (*Id.*).  Defendant Bray noted Plaintiff's hand grips were equal and strong.  (*Id.*).  Defendant Bray noted no swelling, deformity, or open areas, and no acute distress.  (*Id.*).

11

Defendant Bray's examination did not reveal any injuries to Plaintiff's wrists, and she concluded no treatment was necessary. (Doc. 69-5 at ¶ 10; Doc. 69-1 at 18-19). Defendant Bray instructed Plaintiff to follow up with medical staff as needed. (*Id.*). Plaintiff alleges Defendant Bray told him he would be scheduled for an x-ray because his wrist possibly could be broken. (Doc. 10 at ¶ 60). Defendant Bray denies she told Plaintiff this. (Doc. 69-5 at ¶ 11). Defendant Bray has explained that she did not refer Plaintiff to a clinician with a recommendation for x-rays because she determined, in the exercise of her medical judgment, he did not need x-rays. (*Id.*). Plaintiff's medical records do not reflect any order for x-rays nor do they reflect that either of the Nurse Defendants believed Plaintiff had a broken wrist. Nor do the medical records show that any medical professional has diagnosed Plaintiff with a broken wrist.

## II.    Summary Judgment Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is "genuine" if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Id*. at 248.

At bottom, the summary judgment question is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id*. at 251-52.  When answering that question, courts view the evidence in the light most favorable to the nonmoving party. *Scott v. Harris*, 550 U.S. 372, 380 (2007).  But the nonmoving party bears the burden of coming forward with sufficient evidence on each element. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  A mere "scintilla" of evidence is insufficient to meet that burden. *Young v. City of Palm Bay, Fla*., 358 F.3d 859, 860 (11th Cir. 2004).  Likewise, speculation or conjecture cannot create a genuine issue of material fact. *Cordoba v. Dillard's, Inc.*, 419 F.3d 1169, 1181 (11th Cir. 2005).

When the plaintiff's version of events is "blatantly contradicted" by the record, a court "should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott*, 550 U.S. at 380.  Thus, when a video recording of an incident clearly contradicts the plaintiff's version of events, the court views the evidence in the light depicted by the video. *Id*. at 380-81.

To determine what facts are "material" at the summary judgment stage, courts look to the substantive law. *Anderson*, 477 U.S. at 248.  Completing that task here requires an examination of the law governing Eighth Amendment claims of excessive force and deliberate indifference.

13

## III. Discussion

### A. Plaintiff's Eighth Amendment excessive force claim against Defendant Green

Plaintiff claims the Defendant Green violated the Eighth Amendment by using excessive force. The "core judicial inquiry" in considering an excessive force claim is "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson v. McMillian*, 503 U.S. 1, 7 (1992); *see also Whitley v. Albers*, 475 U.S. 312, 319-21 (1986). "When prison officials maliciously and sadistically use force to cause harm," the Court recognized, "contemporary standards of decency always are violated . . . . whether or not significant injury is evident." *Hudson*, 503 U.S. at 9.

To determine whether the application of force was done in good faith or maliciously and sadistically, courts are required to consider four factors: "(1) the need for the application of force; (2) the relationship between that need and the amount of force used; (3) the threat reasonably perceived by responsible officials; and (4) any efforts made to temper the severity of the forceful response." *Ledlow v. Givens*, 500 F. App'x 910, 912-13 (11th Cir. 2012) (citing *Whitley v. Albers*, 475 U.S. 312, 321 (1986)). From the consideration of such factors, "inferences may be drawn as to whether the use of force could plausibly have been thought necessary,

14

or instead evinced such wantonness with respect to the unjustified infliction of harm as is tantamount to a knowing willingness that it occur." *Whitley*, 475 U.S. at 321. In cases in which a collective use of force is alleged, the court need not analyze separately the force administered by each officer to determine which of the blows or other acts, if any, constituted the use of excessive force. *Skrtich v. Thornton*, 280 F.3d. 1295, 1302 (11th Cir. 2002).

"[T]he extent of injury suffered by an inmate is one factor that may suggest whether the use of force could plausibly have been thought necessary in a particular situation." *Hudson*, 503 U.S. at 7 (cleaned up). The extent of injury may also provide some indication of the amount of force applied. *See Wilkins v. Gaddy*, 559 U.S. 34, 37 (2010). As the Court stated in *Hudson*, not "every malevolent touch by a prison guard gives rise to a federal cause of action." 503 U.S. at 9. An inmate who has brought an excessive force claim "may avoid summary judgment only if the evidence viewed in the light most favorable to him goes beyond a mere dispute over the reasonableness of the force used and will support a reliable inference of wantonness in the infliction of pain." *Ledlow*, 500 F. App'x at 913 (internal quotations omitted).

Applying the factors set forth above, reasonable force was used in this case. There is no evidence in the record that would support a reliable inference of wantonness.

Looking first to the need for the application of force, Defendant Green used force because Plaintiff was non-compliant and resisted being taken back to his cell. The video shows that Plaintiff refused to follow a directive and then physically resisted Defendant Green's attempt to redirect him to the back of the sally port for return to his cell. Plaintiff planted his feet, reinforced his physical stance, and tried to pull away from Defendant Green. Although Plaintiff claims he "walked down the hallway with [Defendant] Green in silence" once told to go back to his cell (Doc. 10 at 8), the video shows that is simply not true. Because Plaintiff was being non-compliant and resisting Defendant Green, there was a need for Defendant Green to use force to gain Plaintiff's compliance. *See Bennett v. Parker*, 898 F.2d 1530, 1533 (11th Cir. 1990) (finding that a corrections officer had a need to use force when an inmate was insubordinate and created a disturbance); *see also Cockrell v. Sparks*, 510 F.3d 1307, 1311 (11th Cir. 2007) ("Prison guards may use force when necessary to restore order and need not wait until disturbances reach dangerous proportions before responding.").

16

As for the second factor, the force employed by Defendant Green was closely related to the need presented.  When evaluating this factor, a court should "weigh the prison's security interest in maintaining order against the force used against" the inmate.  *Bennett*, 898 F.2d at 1533.  Defendant Green used progressive force in this case.  He first tried to gain Plaintiff's compliance by tugging on his arm.  Although it is not entirely clear whether Defendant Green fell or intentionally took Plaintiff to the ground, if the facts are construed in the light most favorable to Plaintiff, then Defendant Green took him to the ground after Plaintiff resisted being moved.  Once on the ground, Defendant Green placed his elbows on Plaintiff's back to keep him secured in the prone position.  There was no gratuitous use of force employed by Defendant Green.  The force he applied was directly related to Plaintiff's resistance and the need to gain control of Plaintiff so that he could be returned to his cell.  Although Plaintiff says Defendant Green repeatedly punched him in the face and neck, the video shows that did not happen.  At no point does the video show Defendant Green punching Plaintiff or otherwise striking him in the face or neck.[6]  There was a need to maintain order and obtain compliance, and the force used by Defendant Green was related to that need.

---

[6] The medical records also contain no indication that Plaintiff complained of any injuries to his face or neck after the use of force.  (Doc. 69-1 at 8).

17

The next factor requires consideration of the threat reasonably perceived by responsible officials. Here, Plaintiff's resistance and non-compliance with a directive reasonably led Defendant Green to perceive a threat to maintaining order and discipline at the institution. Defendant Green acted to quell Plaintiff's resistance and to ensure that the situation did not escalate. And he did so with a reasonable amount of force.

Looking finally to the efforts made to temper the severity of the forceful response, Defendant Green used a relatively minor amount of force that caused (at most) minimal injuries to Plaintiff.[7] *See Miles v. Jackson*, 757 F. App'x 828, 830 (11th Cir. 2018) (considering fact that the plaintiff "failed to show that the officers' use of force caused him serious injury" as evidence that the use of force was tempered). Defendant Green grabbed Plaintiff, took him to the ground, and held him there until additional officers could assist in returning him to his cell. Once Plaintiff was secured on the ground, Defendant Green did not use any more force than was necessary to keep him on the ground. *See Collins v. Sheppard*, No. 1:13-cv-31, 2014 WL 5432118, at *7 (M.D. Ga. Oct. 24, 2014) (explaining that "ceasing the use of

---

[7] The post use of force examination revealed that Plaintiff suffered no injuries. Although Plaintiff claims he suffered an injury to his wrist, nothing in the medical records supports that claim.

18

force once a detainee has been subdued" constitutes an effort made to temper the severity of force).  This is not a case where an officer continued to aggressively use force against an inmate once he was under control.  Additionally, shortly after the incident occurred Plaintiff was examined by members of the prison medical staff. That is something the Eleventh Circuit has considered when evaluating this factor. *See Cockrell*, 510 F.3d at 1312 (stating that the prison guards' summoning of medical assistance for the inmate "tempered the severity of the forceful response and [made] it less likely that either of them was acting sadistically instead of in good faith").

Having considered all the factors, Defendant Green's use of force was "applied in good faith to maintain discipline" and "not applied maliciously and sadistically to cause harm." *Ledlow*, 500 F. App'x at 912.  What happened in this case is a far cry from a "malicious[] and sadistic[] use of force to cause harm" that would violate "contemporary standards of decency." *Hudson*, 503 U.S. at 9. Because the evidence in the record will not "support a reliable inference of wantonness in the infliction of pain . . . the case should not go to the jury." *Whitley*, 475 U.S. at 322.  Defendant Green, therefore, is entitled to summary judgment on Plaintiff's excessive force claim.

**B. Plaintiff's excessive force claim against Defendant Seaman**

Plaintiff also asserts an Eighth Amendment claim against Defendant Seaman. That claim appears to be based on Defendant Seaman allegedly helping Defendant Green by forcefully holding Plaintiff's wrist. (Doc. 10. at 9, ⁋ 22). Defendant Seaman denies that he used any force—let alone excessive force—against Plaintiff. The video evidence supports Defendant Seaman's claim that he did not use excessive force against Plaintiff. The video shows that non-party Officer Tremble and an officer (who Plaintiff claims was Defendant Seaman) from the neighboring office assisted Defendant Green in maintaining control of Plaintiff until he could be fully secured.

Assuming it was Defendant Seaman who assisted Defendant Green by holding Plaintiff's right wrist, such conduct was not excessive force. Defendant Green was on the ground with Plaintiff, and it was objectively reasonable for another officer to assist in these circumstances by forcefully holding Plaintiff's wrist. Moreover, the video footage of the incident does not show any officer using excessive force against Plaintiff. No reasonable jury could conclude that Defendant Seaman maliciously and sadistically used force for the purpose of inflicting pain on Plaintiff. Summary judgment, therefore, is warranted on Plaintiff's excessive force claim against Defendant Seaman.

20

**C.    Plaintiff's failure-to-intervene claims against Defendants Neel, Manners, Alligood, and O'Neal, and Plaintiff's failure-to-discipline claim against Defendant Neel**

Plaintiff asserts an Eighth Amendment claim against Defendants Neel, Manners, Alligood, and O'Neal for their failure to intervene in the use of force by Defendants Green and Seaman. (Doc. 10 at 13-14). Plaintiff also asserts a separate claim against Defendant Neel (a supervisor) for his failure to discipline Defendant Green after the use of force. (*Id.* at 14).

"An officer who is present at the scene and who fails to take reasonable steps to protect the victim of another officer's use of excessive force can be liable for failing to intervene, so long as he was in a position to intervene yet failed to do so." *Alston v. Swarbrick*, 954 F.3d 1312, 1321 (11th Cir. 2020) (cleaned up). If the plaintiff fails to establish a constitutional violation with respect to the use of force, then the officers who allegedly failed to intervene to stop the use of force are entitled to summary judgment. *Hinson v. Bias*, 927 F.3d 1103, 1121 (11th Cir. 2019); *see, also Butler v. Sec'y, Fla. Dep't of Corr.*, No. 20-11097, 2021 WL 4279555, at *4 n.4 (11th Cir. Sept. 21, 2021) (holding that a plaintiff cannot maintain a failure-to-intervene claim against an officer if the other officer(s) did not use excessive force).

Here, no reasonable jury could find that any of the FDOC Defendants used excessive force on Plaintiff as explained above. Plaintiff, therefore, cannot succeed

on a failure-to-intervene claim against any other FDOC Defendant. Similarly, Plaintiff cannot succeed on his claim that Defendant Neel failed to discipline Defendant Green because there was no excessive force that would have warranted disciplinary action. Thus, Defendants Neel, Manners, Alligood, and O'Neal are entitled to summary judgment on Plaintiff's claims against them.

### D.   Plaintiff's Eighth Amendment deliberate indifference claim against the Nurse Defendants

Plaintiff claims that the Nurse Defendants—Wohlford and Bray—were deliberately indifferent to his serious medical needs in violation of the Eighth Amendment. The Supreme Court has held that it is "cruel and unusual punishment," under the Eighth Amendment, for prison officials to act with "deliberate indifference to serious medical needs of prisoners." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). That means prison officials are obligated to provide prisoners with "minimally adequate medical care." *Harris v. Thigpen*, 941 F.2d 1495, 1504 (11th Cir. 1991). The deliberate indifference standard is much higher than simple negligence or medical malpractice. *Id*. at 1505. The Eighth Amendment does not require a prisoner's medical care to be "perfect, the best obtainable, or even very good." *Id*. at 1510 (cleaned up). Indeed, the deliberate indifference standard is only met if medical care is "so grossly incompetent, inadequate, or excessive as to shock the

22

conscience or to be intolerable to fundamental fairness." *Id*. at 1505-06 (cleaned up). After all, it is "obduracy and wantonness, not inadvertence or error in good faith, that characterize the conduct prohibited by the Cruel and Unusual Punishments Clause." *Whitley*, 475 U.S. at 319.

To prevail on a deliberate indifference claim, a plaintiff must satisfy two prongs—one objective, one subjective. *Farrow v. West*, 320 F.3d 1235, 1243 (11th Cir. 2003). Satisfying the objective prong requires a plaintiff to show an "objectively serious medical need." *Keohane v. Fla. Dep't of Corr. Sec'y*, 952 F.3d 1257, 1266 (11th Cir. 2020) (cleaned up). A medical need is objectively serious if it "has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention—that, if left unattended, poses a substantial risk of serious harm." *Id*. (cleaned up). To satisfy the subjective prong, a plaintiff must prove that prison officials (1) had "subjective knowledge of a risk of serious harm," (2) they disregarded that risk, and (3) did so in a manner that "was more than mere negligence." *Id*. (cleaned up). The plaintiff's burden of establishing the objective and subjective prongs is "steep." *Id*.

Here, Plaintiff asserts deliberate indifference claims against Defendants Wohlford and Bray for their failure to adequately diagnose and treat Plaintiff's

allegedly broken left wrist. (Doc. 10 at 14). Defendants Wohlford and Bray argue there are no genuine issues of material fact regarding Plaintiff's deliberate indifference claim. The Court agrees.

**1.    Plaintiff has not shown a genuine issue of material fact on the objectively serious medical need prong**

As noted above, Plaintiff must demonstrate an objectively serious medical need to succeed on a deliberate indifference claim. Plaintiff asserts his serious medical need was a "broken" left wrist that he suffered because of the use of force incident. (Doc. 91 ⁋ 28). Having reviewed the medical records submitted in this case, there is no evidence from which a reasonable jury could conclude Plaintiff suffered from an objectively serious medical need. There are no medical records showing that any medical professional has diagnosed Plaintiff with a broken wrist. *See generally Keohane*, 952 F.3d at 1266 (stating that a serious medical need is one that "has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention"). All the Court has is Plaintiff's own self-diagnosis that his wrist was broken. That self-diagnosis is contradicted by the contemporaneously created medical records, which show that Plaintiff did not have any noticeable injuries requiring medical treatment after the use of force incident. The records show that

24

Plaintiff's wrist was examined and found to show no signs of a serious injury.  (*See* Doc. 69-1 at 16-19).  His range of motion was normal and no swelling was detected. (Doc. 69-1 at 18).  Although Plaintiff claims his wrist was painful, such "subjective complaints of pain, unsupported by any corroborating medical evidence or obvious outward signs of injury, do not plausibly suggest a serious medical need." *Cargill v. House*, No. 2:18-cv-0344, 2019 WL 1757554, at *4 (N.D Ala. Mar. 27, 2019). Plaintiff's self-diagnosis of a broken wrist does not create a question of material fact for summary judgment purposes in "the face of contradictory, contemporaneously created medical records." *Whitehead v. Burnside*, 403 F. App'x 401, 403 (11th Cir. 2010); *see also Kayser v. Caspari*, 16 F.3d 280, 281 (8th Cir. 1994) (finding that a self-diagnosis cannot establish a serious medical need in the absence of medical evidence).

Second, there is no evidence from which a reasonable jury could find that Plaintiff had a wrist injury that was so obvious that even a lay person would have recognized the need for medical treatment.  Plaintiff's wrist was examined by both Nurse Defendants, and neither noticed any signs of injury.  His wrist was found to have normal range of motion and no deformities.   (Doc. 69-1 at 16-19). Additionally, both Nurse Defendants have submitted sworn declarations stating that they observed no injuries to Plaintiff's wrist that required medical attention.  (Doc.

25

69-4 at 3; Doc. 69-5 at 2-3).  Although Plaintiff has submitted a statement from a fellow inmate stating that he helped Plaintiff "pop his wrist back in place," (Doc. 1 at 43), that statement is insufficient to create a genuine issue of material fact.  The statement was neither sworn under oath before a notary nor submitted under "penalty of perjury" as required by 28 U.S.C. § 1746.  It, therefore, should not be considered by the Court for purposes of determining if summary judgment should be granted.  *See Roy v. Ivy*, 53 F.4th 1338, 1348 (11th Cir. 2022) (stating that "inmate statements did not satisfy § 1746," and "the district court properly declined to consider them for purposes of summary judgment" because none of the statements "referred to 'penalty of perjury'" as required by § 1746).  The evidence in the medical record shows that Plaintiff was examined by two separate nurses, and neither of them noticed any injuries to his wrist.  Plaintiff's self-serving statements "do not create a question of material fact in the face of contradictory, contemporaneously created medical records."  *Whitehead*, 403 F. App'x at 403.  The Nurse Defendants are, therefore, entitled to summary judgment on the deliberate indifference claim because Plaintiff has not shown an objectively serious medical need.

2.    **There are no genuine issues of material fact regarding the subjective prong of a deliberate indifference claim**

Even if Plaintiff could show that he suffered from an objectively serious medical need, there are no genuine issues of material fact regarding the subjective prong of a deliberate indifference claim.  As previously noted, to satisfy the subjective prong, a plaintiff must prove that the defendants (1) had "subjective knowledge of a risk of serious harm," (2) they disregarded that risk, and (3) did so in a manner that "was more than mere negligence."  *Keohane*, 952 F.3d at 1266 (cleaned up).

There is no evidence in the record establishing that the Nurse Defendants had subjective knowledge of a risk of serious harm because of an injury to Plaintiff's wrist.  Although Defendant did complain of pain in his wrist, neither of the Nurse Defendants saw any indication of an injury to the wrist.  They saw no swelling.  They saw no reduced range of motion.  They did not observe Plaintiff to be in distress. The Nurse Defendants did not observe anything with Plaintiff's wrist that led them to subjectively believe he required medical treatment.  *See Farmer v. Brennan*, 511 U.S. 825, 838 (1994) (stating that "an official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment."); *see also Rodriguez*

*v. Sec'y for Dep't of Corr.*, 508 F.3d 611, 617 (11th Cir. 2007) (explaining a medical provider must draw the inference that there is a serious medical need to satisfy the subjective prong); *Taylor v. Adams*, 221 F.3d 1254, 1258 (11th Cir. 2000) (noting a defendant must have "subjective awareness of facts signaling the need, and an actual inference of required action from those facts.").

Even if Plaintiff could show that the Nurse Defendants were subjectively aware of the risk of serious harm, there is no evidence from which a reasonable jury could conclude the Nurse Defendants disregarded that risk by more than mere negligence. To prevail on his deliberate indifference claim, Plaintiff must show that the Nurse Defendants "response . . . was poor enough to constitute an unnecessary and wanton infliction of pain, and not merely accidental inadequacy, negligence in diagnosis or treatment or even medical malpractice actionable under state law." *Taylor*, 221 F.3d at 1258 (cleaned up). It is well settled that "[m]ere negligence in diagnosing or treating a medical condition" does not constitute deliberate indifference. *Bishop v. Pickens Cnty. Jail*, 520 F. App'x 899, 900 (11th Cir. 2013) (cleaned up). Applying that standard here, there is nothing in the record from which a reasonable jury could conclude that the Nurse Defendants acted with anything more than negligence in failing to diagnose and treat Plaintiff's claimed "broken" wrist. It bears mentioning once again that Plaintiff has come forward with nothing

28

to show that he actually broke his wrist.  And neither of the Nurse Defendants saw any signs or symptoms of an injury that required further treatment.  Thus, it is hard to see how the Nurse Defendants could have been deliberately indifferent by failing to diagnose and treat that claimed injury—an injury that is unsupported by Plaintiff's medical records.

Having examined the record, there are no genuine issues of material fact regarding Plaintiff's deliberate indifference claim against the Nurse Defendants. Thus, they are entitled to summary judgment.

### E. Plaintiff's state law claims against Defendant Green and the Nurse Defendants

Plaintiff's amended complaint asserts state law claims of assault and battery against Defendant Green, and state law claims of medical malpractice/negligence against the Nurse Defendants.  (Doc. 10 at 14).  Where, as here, the Court determines that all Defendants are entitled to summary judgment on Plaintiff's federal claims, there remains no independent federal jurisdiction to support the Court's exercise of supplemental jurisdiction over state claims against any defendant.  *Baggett v. First Nat'l Bank of Gainesville*, 117 F.3d 1342, 1352 (11th Cir. 1997).  Title 28 U.S.C. § 1367(c)(3) provides that the district court may decline to exercise supplemental jurisdiction over claims after it has dismissed all claims over which it has original

jurisdiction. *United Mine Workers v. Gibbs*, 383 U.S. 715, 725–26 (1966). Where § 1367(c) applies, considerations of judicial economy, convenience, fairness, and comity may influence the Court's discretion to exercise supplemental jurisdiction. *See Baggett*, 117 F.3d at 1353. The Eleventh Circuit has encouraged district courts to dismiss any remaining state claims when the federal claims have been dismissed prior to trial. *Raney v. Allstate Ins. Co.*, 370 F.3d 1086, 1089 (11th Cir. 2004).

Taking these factors into account in this case, the Court concludes Plaintiff's state tort claims against Defendant Green should be dismissed without prejudice. Plaintiff may then pursue them in a state court forum. While it would be convenient for Plaintiff to continue litigating his case in this Court, the Court has a substantial number of original jurisdiction cases awaiting review, and neither judicial economy nor fairness to other litigants support retaining jurisdiction of Plaintiff's state claim(s) and delaying justice in other cases. Furthermore, the state court is best equipped to research and rule on matters of state law, and comity would suggest that it should be allowed to do so. Moreover, the supplemental jurisdiction statute contains a tolling provision. *See* 28 U.S.C. § 1367(d) (providing that state claims asserted in federal court along with "related" federal claims "shall be tolled while the claim is pending and for a period of 30 days after it is dismissed"). Thus, Plaintiff's state law claims were tolled while pending in federal court, and he has

thirty days after dismissal by the federal court to re-file in state court. *Artis v. District of Columbia*, 138 S. Ct. 594, 597-98 (2018); *Krause v. Textron Fin. Corp.*, 59 So. 3d 1085 (Fla. 2011). Therefore, Plaintiff's pursuit of any state law claim against Defendant Green in state court would not be prejudiced by this Court's refusal to exercise supplemental jurisdiction.

The Court reaches a different conclusion as to Plaintiff's state law claims of medical malpractice/negligence against the Nurse Defendants because those claims are easily disposed of on the current record. Defendants Wohlford and Bray contend Plaintiff's state claims fail because he did not comply with the Florida Medical Malpractice Act's pre-suit requirement. The Nurse Defendants further contend they are immune from liability under Florida Statutes § 768.28(10).

Florida Statutes § 766.106(1)(a) defines a claim for medical negligence or medical malpractice as "a claim, arising out of the rendering of, or the failure to render, medical care or services." "When determining whether a complaint alleges a cause of action in medical negligence versus simple negligence, the key inquiry is whether the action arises out of medical diagnosis, treatment, or care." *Buck v. Columbia Hosp. Corp. of S. Broward*, 147 So. 3d 604, 606 (Fla. 4th DCA 2014) (cleaned up). As such, "[t]he critical question is whether the plaintiff must rely on

31

the medical negligence standard of care as defined by the statute to prevail." *Pomper v. Ferraro*, 206 So. 3d 728, 731 (Fla. 4th DCA 2016).

Here, Plaintiff simply relabels his deliberate indifference allegations against the Nurse Defendants as a "tort of negligence under the law of Florida." (Doc. 10 at 14). Because Plaintiff alleges the Nurse Defendants breached a duty related to medical care, this claim is a medical malpractice claim. As such, Plaintiff is required to comply with the Florida Medical Malpractice Act's pre-suit notice and screening requirements. *See Kukral v. Mekras*, 679 So. 2d 278, 280 (Fla. 1996) (holding Chapter 766 sets forth a pre-suit investigation procedure that a claimant "must follow before a medical negligence claim may be brought in court"); *see also Weaver v. Myers*, 229 So. 3d 1118, 1121 (Fla. 2017) ("[B]efore filing a medical negligence action in Florida, a claimant must satisfy statutory requirements, which include conducting a presuit investigation process to ascertain whether there are reasonable grounds to believe that the defendant medical provider was negligent, and that the negligence resulted in injury to the claimant."). Prisoners asserting medical negligence claims are required to comply with these pre-suit requirements. *See Harris v. Sheriff, Jefferson Cnty. Fla.*, 460 F. App'x 896 (11th Cir. 2012).

A claimant under Florida's Medical Malpractice Act must conduct a pre-suit "investigation to ascertain that there are reasonable grounds to believe that: (a) Any

named defendant in the litigation was negligent in the care or treatment of the claimant; and (b) Such negligence resulted in injury to the claimant." Fla. Stat. § 766.203(2). A corroborating report by a medical expert must be provided to the defendant at the time the notice of intent to initiate litigation is provided. *Id.* A claimant must also provide the defendant 90 days' notice prior to filing claims for medical malpractice or medical negligence. Fla. Stat. § 766.106(1)-(3). The pre-suit notice is a condition precedent to maintaining such a suit. *Univ. of Miami v. Wilson*, 948 So. 2d 774, 776 (Fla. 3d DCA 2006).

Florida's pre-suit notice provisions are strictly construed. *See Patino v. Einhorn,* 670 So. 2d 1179, 1179 (Fla. 3d DCA 1996) (holding the pre-suit notice provisions "are limitations on Article I, Section 21 of the Florida Constitution, and therefore should be strictly construed"). If the Florida Medical Malpractice Act's requirements are not satisfied, a court should dismiss the complaint. *See Goldfarb v. Urciuoli*, 858 So. 2d 397, 398-99 (Fla. 1st DCA 2003); Fla. Stat. § 766.206(2).

Here, Plaintiff admits he did not comply with the pre-suit notice requirements. (Doc. 90 at 17-18). Because there is no genuine dispute that Plaintiff failed to comply with Florida's pre-suit notice provisions, Defendants Wohlford and Bray are entitled to summary judgment in their favor on Plaintiff's state law medical malpractice/ negligence claims. *See Acevedo v. First Union Nat'l Bank*, 357 F.3d

1244, 1247 (11th Cir. 2004) (holding that summary judgment should be entered against a party who fails to make a showing sufficient to establish the existence of an essential element of his case, and on which he bears the burden of proof at trial).

## IV.    Conclusion

For the reasons above, it is respectfully **RECOMMENDED** that:

1.      Defendants Green, Neel, Alligood, Manners, and O'Neal's motion for summary judgment (Doc. 66) be **GRANTED** with respect to all Plaintiff's federal claims.

2.      Defendants Wohlford and Bray's motion for summary judgment (Doc. 69) be **GRANTED** with respect to Plaintiff's federal and state law claims.

3.      Plaintiff's state tort claims against Defendant Green be **DISMISSED** without prejudice to Plaintiff pursuing them in a state court action.

4.      All other pending motions be **DENIED** as moot.

5.      The Clerk of Court be directed to enter judgment accordingly and close this case.

At Pensacola, Florida this 14th day of February 2023.

/s/ Zachary C. Bolitho
Zachary C. Bolitho
United States Magistrate Judge

34

## <u>NOTICE TO THE PARTIES</u>

Objections to these proposed findings and recommendations must be filed within fourteen days of the date of this Report and Recommendation. <u>Any different deadline that may appear on the electronic docket is for the Court's internal use only and does not control</u>. An objecting party must serve a copy of the objections on all other parties. A party who fails to object to the magistrate judge's findings or recommendations contained in a report and recommendation waives the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions. *See* 11th Cir. Rule 3-1; 28 U.S.C. § 636.